Jean Reese, USC Immigration Clinic, for Mr. Pedro Durand. I will aspirationally like to reserve five minutes for rebuttal. Mr. Durand's case should be remanded for three reasons. One, the removal order is invalid. Two, the motion to continue was denied on an erroneous legal basis. And three, the CAT analysis applied the wrong standard. And I'll start with the CAT analysis. Here, the BIA treated two separate sources of potential torture to Mr. Durand as that treated them individually in the analysis instead of aggregating. So first, the court looked at the risk he faced as a deportee. Mr. Durand has been in the United States since he was, I believe, three months old. Well, it's sort of unique facts because, you know, actually probably he'd be a dreamer but for the fact that he had that little attempted murder charge and went to prison. So he's not a dreamer anymore. The dream's over there on that one. But that being said, he hasn't lived in Mexico. And that's not anyone's fault one way or the other. But he's not going to get the benefit of PEF persecution because as a three-month-old he wasn't persecuted. So he's got to tell us what, you know, how would you be persecuted. Correct. And there is country, excuse me, country conditions evidence that show deportees who specifically from the U.S. are targeted because they're presumed to have money. Your counsel, is there anything following up on Judge Callahan's question? Is there anything that would sort out your client from every other deportee with your client's sexuality? Is there anything, if we said that he established or that there was enough there to get cat relief, is there anything that would not have that applicable to anyone who had those same two characteristics? Well, he, the length of time he's been in the U.S. is significant. His tattoos are very different. Not everybody has the same tattoos. And I think the fact that he is also bisexual increases the risk of harm. And the BIA didn't look at those two things together. But just. Well, his tattoos, I kind of am a little skeptical of how they're being portrayed. Because, you know, Riverside isn't considered the pride of the United States. And I looked at those tattoos a little more like gang tattoos. I didn't think he was so happy it was from Riverside. It looks like he was from a Riverside gang. Well, I don't know in the record that that's been established. And perhaps he is very proud of being from Riverside. But I think the point is that he, there's also evidence that people with tattoos are presumed to be forced to work for cartels and things like that. So I think it's not, is he a gang, is he not a gang? He is vulnerable because he has these tattoos. He's going to be targeted. He's a deportee. But also, he doesn't conform to gender roles because he is bisexual in Mexico. And that increases the risk. And the board just looked at him being a deportee and said, because he hasn't established he's at more risk as a deportee than anybody else in Mexico, on that issue he doesn't meet his burden. And I think that's explicit language that shows the court isn't looking at the different sources and reasons for torture as the court should. The board, excuse me. The law has always been that notwithstanding the general country condition reports, the respondent still has to show with particularity why he or she is at risk. And it's difficult for your client to do that, given the fact that he's never lived in Mexico. So we don't really know, other than the general country condition reports, how he's actually going to be treated. Well, I think that's always an issue with CAT analysis because it's forward-looking future. It is, in a way, you're talking about a hypothetical risk of torture. And is that risk over 51%? That's the backdrop of some kind of past persecution, even if it's not sufficient as a matter of law to establish past persecution. And what's difficult here is that he has no track record at all because he's never lived in Mexico. And apparently there are some places in Mexico to which he could go where he might be safer than other places in Mexico. Isn't that correct? That there are some places regarding the fact that he's bisexual where there's expanded protections. And I'll talk about that in a second. But I did want to address your first point of your question is, past torture is not a determinative factor. It's one of the many factors. I understand that. But what's unique about this case, and I can't remember too many other cases that I've had on similar facts, where there's no history of living in the country at all. Yeah. I mean, I agree with you. There is no history because he came here since his. And you agree that the BIA stated the proposition that Judge Talman stated in order for a respondent to demonstrate that he's more likely than not to be tortured if removed. He must demonstrate that, quote, he would be subject to a particularized threat of torture. Right. And they know that he's got these riverside tattoos. And they know that his claim of bisexuality. So, I'm not sure that that wasn't. You're saying it wasn't considered. But it doesn't seem to me that it wasn't considered. I think it was considered separately as opposed to together. So, the individual characteristics are his tattoos, his bisexuality, his being a deportee. And all of those things need to be considered together. So, even if the court says, well, they did consider all these characteristics, they considered them in separate silos. So, deportee was considered based on the risk compared to the rest of the Mexican population. Are those their magic words? Well, there are. I mean, so in this regard, what are the magic words that weren't used? Well, the board said we agree that he did not meet his burden to show he's at more risk of harm than anyone else on this issue, this issue being a deportee. And then moved to his being bisexual and siloed that under a relocation analysis that Mr. Duran showed he couldn't not relocate to one of these states where there's more protections. So, the magic words would be after the list of all of the things. And even though it looks like we considered all of these things, we want to reiterate we consider all of these things. Under a totality of the circumstances standard. Is that the magic? Well, the board does talk about in the aggregate, as in at the end, they say even in, he didn't meet his burden even in the aggregate. But if you're looking at the explicit language of the board and what the analysis is. I agree with what you just said. It seems like it's putting a nail in the coffin. But the language in the board's decision shows it was actually contradictory to that. So, I guess what I'm saying is just saying in the aggregate doesn't mean you actually did that analysis. And I think that that. So, again, in a sentence, the immigration judge, therefore, concluded that the respondent did not demonstrate that he in particular faces a greater than 50% risk even in the aggregate. We agree that the immigration judge is correct. Those aren't the magic words. They're not. Not if the words are contradictory in the board decision. With the board's two reasons for supporting the denial is one, he didn't meet his burden on the issue of deportee based on the country condition evidence. And two, he didn't show he could not relocate to a state that's more friendly to LGBTQ individuals. And so, those two reasons of the board, those are the two rationales by the board in supporting the denial. And those reasons reflect that the aggregation was not actually done. And we have this impermissible burden on Mr. Duran to show relocations an impossibility. Well, okay, but the government does, they put, they say you can relocate. And this is how, and this is we believe that you can relocate. If anyone chooses to do nothing about it, then that's the evidence that the court has. He didn't choose to do anything about it. So, whether you want to call it an impermissible burden or whatever, in every case that we look at, the way that it comes down is the government says, hey, you can, the country reports say you can relocate in these places. If he chose to stand on that, which he did, he wants to say that it was an, you know, that why can't the court just say the evidence I have in front of me is you can relocate. You haven't told me any reason that you can't go to those places. So, I have to deal with the evidence that I have. Are we supposed to make up evidence for him? No, but the distinction is we're looking at what the board did and what the board said. And the board said, not you can relocate. The board said you didn't prove that you can't relocate. And the court in, or this court in Xochitl Jaime Zibar stated that that was an impermissible allocation of the burden to prove impossibility of relocation. So, in this case, the language is even more explicit. The court says you, not that you can relocate. The court says you didn't show you can't relocate. But isn't it more tautological in the way that Judge Callahan described it? The government has introduced evidence that you can't relocate and you haven't done anything. I mean, isn't, isn't, is that really shifting the burden of proof as opposed to saying, you know, we can only, we can only judge the cards you all have dealt us. Well, the evidence did show that the increase in protections actually resulted in a surge of violence against LGBTQ individuals, that those protections aren't uniformly enforced. So, the evidence doesn't show that full stop, he can live anywhere. There is evidence that shows that these protections are insufficient. They're not effective and they're not enforced. Ms. Rice, I don't want you to sit down before we get into the two other issues. Can you explain to me why Mr. Duran should escape his challenge to be in a short removal order when he failed to exhaust his administrative remedies on that issue? Yeah, I mean, I think this is a, this is a unique case because the reason he failed to exhaust this challenge to the removability finding is because he was denied a continuance for an attorney. But later when he had an attorney, he was represented. No one ever said, let's revisit that. No, but the, but the IJ misled the attorney in affirmatively stating that Mr. Duran admitted the allegations and conceded removability where he did not do that. The judge asked him whether or not he believes some. But even if you're right, the transcript was available, right? Well. The lawyer could have gotten it. The lawyer could have requested it, but the lawyer was relying on the judge and I don't think that there was a, you know, you would automatically think the judge wasn't being truthful. On your first point, wasn't there, wasn't there a month gap there that he had to get a lawyer? I believe it was 19 business days. So he'd only asked for one continuance and he was given 19 business days and then, and there is case law we cited too in our brief that says that just one continuance was deemed not to be enough time. And so because of this error and then because of the information provided to the attorney and then he represented himself at the board, he was never able to raise this. And I think that that's a unique situation where an exception should be made to the exhaustion. So his lawyer didn't raise the subject when he appeared as the second proceeding with counsel? I believe, I think the lawyer was misled by the judge. The judge said he. So it's all our fault that we didn't do a good job representing your client? No, I think, I think the immigration judge said let me bring it up to speed and said he admitted and conceded. In an immigration court, many people, especially when they're represented by attorneys, just admit and concede and then seek asylum. So I don't think it was something that would have really, frankly, prompted the attorney to say I'm not sure that's the case. I'm going to double check and ask. And then also I would add he was detained at this time. So asking for a production of the audio to then listen prolongs the detention. But there is no question though that he was removable, right? Well, I don't think the government met its burden to prove. So I can't say whether or not there's a question that he was removable because the burden. What did he do about the attempted murder? Tell us what's wrong with that. That was not alleged as a charge of removability. There was no record to establish that. My last question for you on the remaining issue is why is there an abuse of discretion on denying change of venue when his attorney admitted that he was using the motion to change venue as a method by which to challenge the conditions in his detention facility at Imperial when he wanted to be moved to Huddle Hospital? Well, I think that the attorney could have more specifically set out other reasons. The attorney could not have said it, but she did. I mean, the attorney listed those reasons in the motion. The judge said, look, I didn't read your motion. The attorney. That's it. I don't have the authority to tell Homeland Security where they're going to hold detainees. Right. I mean, you've got to pursue that with a habeas corpus petition before a federal district judge. Well, but even if your reasons had been better, he didn't call any witnesses at the hearing. Even if the reasons were like it would be closer to witnesses, we could talk more. Didn't do it. Well, it did. So, what it could have, should have is your best argument, I guess. I think our best argument is this was legal error. There are regulations that said if there's a motion to change venue, and the motion changed venue led witnesses, attorney, family members, that the court has to consider that. But that has to be exhausted, right? And that was mentioned in the board that the court. Well, I'm looking at, and he did apparently do this pro se, his brief on appeal to the board, although it looks to me like he might have had a little help doing it. But the only section in his appeal is titled whether I.J. Robinson erred by failing to consider conditions of confinement in denying the motion to change venue because it was unconstitutional. That's AR7. And as far as I can tell, the stuff about the witnesses and the convenience was never raised to the board. That the only thing raised to the board was this is a due process violation. So, why wouldn't the board have been justified in ruling on the only issue that he raised to the board? Well, because the board reviewed the issue, and it was pro se. So, he raised the issue of the motion to change venue. And the board's rationale is the judge denied it on the proper basis that he didn't have jurisdiction over confinement. And so, the board chooses the wrong basis. The board could have said he didn't raise the issues, he didn't show prejudice or any of those things, but the board just said the judge was correct in denying the motion based on not being able to. Well, I think it was like he raised only one issue, and the board decided the only issue he raised. Is what I just said factually right in terms of what he raised in the appeal to the board? I think he argued, I agree with you. He argued in his appeal about the conditions of confinement, but the board didn't limit its review to the conditions of confinement, nor should it have it reviewed whether or not the motion to change venue was denied on a proper basis. And the board concluded it was, and that's wrong. Because the, I.J. failed to consider the other factors that give the judge an authority to grant a change of venue. All right, thank you. So, we've taken you over, so you don't have any time left. I'll give you one minute for rebuttal. Thank you. Thanks. All right, we'll go to the government. Good morning. Morning. Morning, Your Honors. May it please the court, Tim Remitz. I'll be back, United States Attorney General. The record is not compelled to conclusion that Petitioner established a clear probability of torture in Mexico. There were originally three bases for potential torture in Petitioner's side of gang improvement. Because of his tattoos, targeting for ransom, kidnapping by gangs, and cartels because he appeared Americanized, and the third was his bisexuality. He's down to two because his opening brief only references his bisexuality and the fact  that the agency properly found that even the aggravated, these two potential sources of torture did not amount to more than a 50% chance that Petitioner would be subject to torture. Starting with the bisexuality claim, first principal factor of the cat claim is past torture, and there's no past torture. As the panel noted, Petitioner has not ever lived in Mexico since he was an infant. So, we rely completely on country conditions and documentary evidence, and the documentary evidence for bisexuality, for the most part, pertains to awful mistreatment that transgender women have experienced. There's not a lot of documentation he submitted showing that bisexual men are subject to significant harms in Mexico. Moreover, the records just properly found the documentary evidence Petitioner submitted also shows there are places where he could safely relocate within Mexico. I know Petitioner describes this as improper burden shifting. However, what it is is that the immigration judge cited the evidence, which does show a document that Petitioner submitted shows that there are actually five places or four places that have been described as safe for LGBT individuals. Monterrey, Guadalajara, Mexico City, and Puerto Vallarta are affirmatively safe for LGBT individuals. That was the evidence in the record, and the immigration judge, during the merits hearing, asked Petitioner to respond to that evidence. There's no burden shifting. There's evidence in the record. He just asked Petitioner to respond, and Petitioner's response wasn't satisfactory. He simply said he didn't think that was safe, despite what the document said, or he said it wasn't as safe as the United States. The immigration judge properly found this evidence. Nonetheless, it showed safe relocation was possible. That's his first potential source of torture is bisexuality, and the second potential source that he claimed was that he would be seen as Americanized. As the immigration judge explained, this would involve a lot of speculation, that he would appear Americanized because of his tattoos. His tattoos were a $100 bill, an inverted C-A, the word Riverside on his hand, and a bell. These tattoos aren't going to be identified to anyone that means, like, that is from the United States or spent a long time in the United States and, therefore, is wealthy. I don't think they would mean that to anybody. And so, it was speculated that he would be targeted, and it was speculated that he would be kidnapped and ransomed. And documentation that he submitted showed that, unfortunately, deportation happens over the southern border to the northern border states, where it's just high crime rates in northern border states. Not that deportees are targeted in any significant numbers, more than anyone else in these areas experience a lot of high crime. Moving on from his cat claim, excuse me, to the immovability challenge, it's not exhausted. Clearly, he had never raised it before. An opportunity not only for the immigration judge, because he did take counsel, but also for the board, he didn't raise the immovability challenge in either of those instances, and, therefore, it's not exhausted. And, though the court has previously excused exhaustion, where there is not a remedy available as of right, but, clearly, it was here. He could have raised it at any time, and he had an attorney, ultimately, before the immigration judge, who was given a continuous to find out before the colloquy where he went over the allegations to the NTA. There's no missteps here by the immigration judge, as far as immovability goes, and petitioner has admitted alienage. In his documentary evidence, it was a solid application, declaration he said, I'm a Mexican citizen. And, once you, or once the alienation has been established, the burden is on the petitioner to prove that his manner of entry was lawful. He's never shown anything, or ever even tried to establish that his manner of entry was lawful, and, therefore, the immovability charge is clearly and convincingly proved. Lastly, for the venue question, as the panel noted, he didn't exhaust his challenge. I know the government didn't make this point in our brief, but it's a good point. The SBIA brief only challenged the conditions, or the denial of venue based on the conditions of his confinement, didn't talk about his witnesses or his attorney. And, moreover, what we did talk about in our brief is they're all delayed. It doesn't, I can't understand why he's making this claim, because he didn't present any witnesses. Or, any witnesses, it's easy to explain, would support his potential sources of torture for bisexuality, or as an Americanized individual. So, that denial of motion to change venue is neither arbitrary nor capricious. The immovability challenge is not exhaustive, and the record is clear. It's not a compelling conclusion that established a clear probability of torture. Does the panel have any questions? I don't see the rest of my time. We don't have any questions. Thank you. Thank you. I hope you feel better. Thank you. I'm much better. Okay. Well, and thank you for not exposing us to germs. We appreciate that. I thought people might appreciate that. Yes, thank you. All right. I'll give you one minute per rebuttal. Thanks, Erin. I'll just respond to three points. One, government counsel talks about country conditions regarding LGBTQ as being focused on transgender women. The board's rationale in finding that he didn't face a risk of torture as being a bisexual was based on the, like I said, the individual analysis, but also on relocation. The board didn't discuss, oh, the evidence only showed transgender women. So, that is not within the scope. The second point is the asylum application that the government counsel says proves alienation was provided after the violation, after he was denied an attorney, and after the attorney was told that he had already conceded and it removed the ability to admit at the violation. So, that is part of the problem. And then, finally, the arbitrary and capricious standard is also when the government does not follow the law or its own regulations, excuse me, the government, the BIA. And so, the BIA here denied a change of venue because it didn't have jurisdiction to move a detention facility that is not following the regs, which requires a judge to consider certain factors, which weren't done here. So, that's legal error, and that is an abuse of discretion. It's an interesting argument when the sole basis for the motion is a challenge to the conditions of confinement. So, your argument, I guess, is that without regard to that narrow motion, the judge nonetheless erred in not considering other factors that the lawyer didn't raise. Am I understanding your argument correctly?  The motion to change venue included witnesses, included evidence as a basis. So, the record shows that was a basis, and so conditions were not a sole, the sole root basis. Even though the lawyer only raised the one issue, and that issue was not pursued in the brief to the board on the other ground. Well, the lawyer argued about one issue, but didn't waive the motion, and the motion was properly part of the record, and properly what the judge had to consider. All right. This matter will stand as admitted. Thank you both for your argument in this matter, and thank you both for appearing, and thank you for your pro bono work. Thank you, honors.
judges: TALLMAN, CALLAHAN, BENNETT